# In the United States Court of Federal Claims

Nos. 12-863C and 12-883C

(Filed Under Seal:  April 22, 2013)

Reissued:  May 6, 2013[1]
_____

|  |  |
|---|---|
| INSIGHT SYSTEMS CORP., and CENTERSCOPE TECHNOLOGIES, INC., | * Pre-award bid protest; Cross-motions for<br>* judgment on the administrative record;<br>* Standard of review – *Bannum*; Proposals<br>* received by government mail server, but not<br>* forwarded to the next server in the<br>* government mail system, were covered by the<br>* Government Control exception to the "late is |
| Plaintiffs, | * late" rule found in 48 C.F.R. § 52.212-<br>* 1(f)(2)(i)(B); Plain meaning of regulation |
| v. | * controls; *Watterson Constr.*; Specific/general<br>* canon of construction; Contrary GAO |
| THE UNITED STATES, | * decisions rejected; Injunction issued. |
| Defendant. |  |

_____

## OPINION
_____

*Richard J. Webber*, Arent Fox, LLP, Washington, D.C., for Insight Systems Corporation; *John R. Tolle*, Barton, Baker, Thomas and Tolle, LLP, McLean, VA, for CenterScope Technologies, Inc.

*Matthew Paul Roche,* Civil Division, United States Department of Justice, with whom was Principal Deputy Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

Coming before this court, with disturbing frequency, are bid protests that find defendant straining to defend agency decisions to reject, as purportedly late, proposals submitted by

_____

[1]  An unredacted version of this opinion was issued under seal on April 22, 2013.  The parties were given an opportunity to propose redactions, but no such proposals were made.  Nevertheless, the court has incorporated some minor changes into this opinion.

contractors electronically.[2]  These cases somewhat painfully illustrate the thorny issues that can arise when the outmoded provisions in the Federal Acquisition Regulations (FAR) governing the delivery of electronic proposals – which date back to the last century – are applied to modern computer technology.  As this deficiency is well-documented,[3] and because, notwithstanding it, Federal agencies continue, in the name of electronic commerce, to exhort offerors to submit their proposals electronically, one might think that those same agencies would be hesitant to construe the FAR in a way that springs technological traps on their contracting partners – but, then again, perhaps not.

In this case, Insight Systems Corp. (Insight) and CenterScope Technologies, Inc. (CenterScope) both electronically submitted quotations in response to a request for quotations issued by the United States Agency for International Development (USAID).  Unfortunately, those electronic communications were sent when one or more of the internal servers that USAID's contractors use in processing the agency's electronic mail apparently were malfunctioning.  Although the emails containing the proposals were received and accepted by the initial server in USAID's mail system before the submission deadline, they were not forwarded on to the next server in the mail delivery system because of an internal processing error.  The contracting officer rejected the quotations as untimely because they were not received in her electronic mailbox before the deadline.  Arguing that "late is late," defendant claims that it is irrelevant that the delays here occurred as a result of the malfunction of government computers.  At issue is whether a different view is reflected in FAR § 52.212-1(f)(2)(i)(B), which provides a "Government Control" exception to the late-filing rule that plaintiffs claim applies here.  Although defendant argues that this exception only covers paper filings, the court, for a host of reasons, disagrees.  Because it finds that the exception should have been applied here, the court concludes that USAID's refusal to accept plaintiffs' proposals was arbitrary, capricious, and contrary to law.  As such, the court **GRANTS** plaintiffs' motions for judgment on the administrative record and **DENIES** defendant's cross-motion for judgment on the administrative record.  An appropriate injunction is entered.

I.      **BACKGROUND**

The administrative record in this case reveals the following:

---

[2]  *See, e.g.*, *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549 (2012); *Watterson Constr. Co. v. United States*, 98 Fed. Cl. 84 (2011).

[3]  *See, e.g.*, Vernon J. Edwards, "Late Proposals:  Avoiding the Mess," 26 No. 6 Nash & Cibinic Rep. ¶ 31 (2012) (noting that these rules are marked by "inappropriate and obsolete terminology, poor organization, [and] poor writing"); *see also* Ralph C. Nash, "Postscript:  Late is Late," 25 No. 1 Nash & Cibinic Rep. ¶ 2 (2011) (citing a need to inject more "rationality into the equation").

On June 8, 2012, USAID issued Request for Quotation (RFQ) No. SOL-0AA-000068 "seeking quotes for services in support of [USAID's Bureau of] Global Health Support Services." The RFQ anticipated the award of a task order under the General Service Administration's Federal Supply Schedule to a company eligible under GSA's FSS 874 for Mission Oriented Business Integrated Systems (MOBIS). The procurement was also a total set-aside for small businesses participating in the Small Business Administration's Section 8(a) Disadvantaged Business Development program.

Quotations in response to the RFQ were originally due on July 9, 2012, at 11:00 am EDT. The due date was subsequently extended to July 16, 2012, at 11:00 am EST, and then to July 23, 2012, at 2:00 pm EST.[4] The RFQ contained conflicting delivery instructions. In Attachment 1, it stated, "[q]uotes submitted in response to this RFQ will be received . . . electronically by email only." The RFQ then provided the email addresses of the contracting officials, Alina Schulte and Alisa Dunn (the contracting officer). In Attachment 3, the RFQ directed offerors to submit a hard copy quote to the attention of Ms. Dunn at USAID's Washington, DC offices (although it again listed both Mss. Schulte's and Dunn's email addresses). In an undated question and answer document, USAID clarified that although "[t]he preferred delivery method is physical submission via mail or hand delivery," email delivery was acceptable, but that "it is the vendor's responsibility to make sure that USAID receives the technical and price quotes with the correspondent attachments." The RFQ instructed that "[q]uotes must be received by the closing date and time by the person and the place designated to be considered received in time."

Both Insight and CenterScope submitted timely quotes. On or around September 24, 2012, USAID notified plaintiffs that it had made the award to a third company, BLH Technologies, Inc. (BLH). On September 26, 2012, and September 27, 2012, respectively, CenterScope and Insight protested this award to the United States Government Accountability Office (GAO). By letter dated October 15, 2012, USAID advised GAO that it had decided to take corrective action in response to the protests, by reopening discussions with those offerors that were in a competitive range and by inviting the submission of "revised final quotes." Consequently, on October 24, 2012, the GAO dismissed the protests.

On November 2, 2012, USAID sent letters to plaintiffs informing them that they were in the competitive range. On November 8, 2012, USAID issued written discussion questions to the offerors in the competitive range. The letters stated that "[r]evised final quotes should be submitted electronically to [Ms. Schulte's email address] and [Ms. Dunn's email address] by COB Wednesday, November 21, 2012." On November 19, 2012, USAID amended the RFQ to indicate that "[r]esponses to USAID Discussion questions dated November 8, 2012 can be submitted as an attachment," and that "[t]he deadline to submit final revised quotes has been

---

[4] For reasons unexplained, the amendments to the RFQ used Eastern Standard Time, even though Eastern Daylight Time, which was the "local time," began on March 11, 2012, and ended on November 4, 2012. *See Energy Policy Act of 2005*, Pub. L. No. 109-58, 119 Stat. 594 (2005) (codified at 15 U.S.C. § 260a(a)); *see also Lab. Corp. of Am.*, 108 Fed. Cl. at 554 n.5.

extended from COB (5:00 pm) Wednesday, November 21, 2012, to COB (5:00 pm) Tuesday, November 27th."

Emails from outside sources directed to USAID email addresses, such as those of the contracting officials listed above, pass from the outside mail server[5] through a sequence of three agency-controlled computer servers, before they are ultimately delivered to the recipients. First, such emails are received by one of four email-receiving servers, known as the "Google USAID Cloud GMS/Postini Inbound Infrastructure" (Google Postini). The Google Postini servers, which USAID utilizes through a contract with Computer Science Corporation (CSC), checks the inbound email messages for spam, viruses, and malware. To complete this security check, the Google Postini server must establish and maintain a connection with the sending server. Once this security check is passed, the email is routed to the "USAID Internal MS Exchange Bridgehead Servers," and, finally, onto one of several "USAID Internal MS Exchange Mailbox Servers." The last of the servers in this sequence distributes the message to the recipient's mailbox.

On November 27, 2012, at 3:38 pm EST, Nancy Abramson, an Insight employee, sent an email attaching Insight's revised quote and associated documentation to Ms. Dunn and Ms. Schulte. The email, with its attachments, reached one of USAID's Google Postini servers at 3:41 pm EST. A connection between Insight's server and the Google Postini server was established and the email passed the security check. However, the Google Postini server was unable to send Insight's email/attachments to the bridgehead servers. Rather than store this message, the Google Postini server, following its protocol, repeatedly contacted Insight's sending email server requesting that it resend the email. As part of this process, the Google Postini server repeatedly sent Insight's mail server the following error message – "451 Failed in remote data – psmtp." The documentation for the Google Postini server describes the significance of a "451 message" in the following terms:

> The message security service throws this deferral when the sending [message transfer agent (MTA)] has completed transferring the message data, the security service has processed the message and has decided to forward it on to the receiving MTA, and then, while it was in the process of transferring the message, the connection closed abruptly or the session was ended prematurely. Because of this abrupt ending of the session between the security service and the receiving MTA, this deferral is issued back to the sending MTA so that it will retry the message at a later time.

---

[5] A server is a computer system that uses various protocols to run one or more services as a host. Depending on the service involved, such a server might be involved in database or file management, printing, web-access, or, as in this case, mail delivery. *See* Harry M. Gruber, "E-Mail: The Attorney-Client Privilege Applied," 66 Geo. Wash. L. Rev. 624, 627 n.35 (1998).

While these 451 messages were received by Insight's email server, they were not transmitted to Insight, which was unaware of the problem.  Insight's email server attempted to resend the email approximately twelve times between 3:39 pm EST and 5:00 pm EST, but each time, the email transmission did not go beyond USAID's Google Postini servers.  At 5:17 pm EST, one of USAID's Google Postini servers finally passed the email on to one of USAID's bridgehead servers.  Insight's email reached Ms. Dunn's inbox at 5:18 pm EST and Ms. Schulte's inbox at 5:57 pm EST.

At or about this same time on November 27, 2012, CenterScope was experiencing similar difficulties in transmitting its quotation.  CenterScope employee Frank Jacobson first sent an email to Ms. Dunn and Ms. Schulte at 4:39 pm EST, attaching thereto CenterScope's revised technical and price quotes.  CenterScope received a delivery confirmation message from its server at 4:39 pm EST, but that confirmation stated, "[d]elivery . . . is complete, but no delivery notification was sent by the destination server."  At 4:42 pm EST, Mr. Jacobson contacted Ms. Dunn by phone and asked her to confirm receipt of CenterScope's email; Ms. Dunn stated that she had not received the email.  At 4:48 pm EST, Mr. Jacobson forwarded the delivery confirmation to Ms. Dunn and Ms. Schulte, and asked them to confirm via email that they received the 4:48 pm EST email.  In the same email, Mr. Jacobson stated that just in case there were "sizing issues" with the attachments, he would resend the quote as two separate files, with the first file attached to the 4:48 pm EST email.  At 4:49 pm EST, Mr. Jacobson sent a second email attaching the second file.  Because he had not received any response from USAID, at 4:56 pm EST, Mr. Jacobson sent another email to USAID attaching CenterScope's quotes.  He received another delivery confirmation message at 4:56 pm EST.  Finally, at 5:00 pm EST, Mr. Jacobson sent an email to USAID indicating that he was attaching the price quote but failing to include any attachments.  In response, at 5:04 pm EST, Ms. Schulte indicated that she did not receive CenterScope's price quote attachment.  Ms. Schulte received Mr. Jacobson's first email (sent at 4:39 pm EST) at 6:07 pm EST.  Ms. Schulte received Mr. Jacobson's 4:48 pm EST email (attaching only the technical quote) at 4:50 pm EST.  Mr. Jacobson's 4:49 pm EST email (attaching the price quote) did not reach Ms. Schulte's inbox until 5:15 pm EST.  Ms. Schulte received Mr. Jacobson's 4:56 pm EST email at 6:08 pm EST.  Finally, Ms. Schulte received Mr. Jacobson's 5:00 pm EST email at 5:01 pm EST.[6]  CenterScope's first email was initially delayed at 4:39 pm EST, which, based on what was occurring with Insight's messages at about the same time, indicates that one of USAID's Google Postini servers received the message and responded with a 451 error message.[7]

---

[6]  Though the record does not delineate clearly which emails were received by Ms. Dunn at particular times, Ms. Dunn did receive emails from Mr. Jacobson at substantially the same times as those indicated above.

[7]  Insight was able to recover its server logs, but CenterScope was unable to collect the same type of logs because its email provider deleted such logs after seven days.  Although CenterScope did not recover its server logs, plaintiffs provided expert statements indicating that

BLH timely submitted its quote, which arrived in Ms. Schulte's inbox at 3:17 pm EST.

On November 28, 2012, Ms. Schulte sent an email to "CIO-Helpdesk (USAID)" asking the helpdesk to "let [her] know of the time [plaintiffs'] emails reached USAID['s] server." On December 3, 2012, Ms. Schulte forwarded her November 28 request to Scott Fulton, an employee with CSC, the contractor which runs USAID's email servers. Ms. Schulte indicated in the same email that the "request is urgent" and that "we need a response in the next half an hour." About 45 minutes later, Mr. Fulton responded by sending annotated computer logs, or "internet headers," that provide background email transmission information. Those logs showed, according to Mr. Fulton's annotations, that Insight had sent its email attaching its revised quote at 3:38 pm EST on November 27, 2012, and that the email was delayed twice before reaching USAID's mailbox servers at 5:17 pm EST and Ms. Schulte's inbox at 5:18 pm EST. With regard to CenterScope, the annotated logs indicated that one of CenterScope's emails was sent at 4:49 pm EST and was twice delayed before reaching both USAID's mailbox servers and Ms. Schulte's inbox at 5:15 pm EST, on November 27, 2012.

On December 4, 2012, Ms. Dunn sent each plaintiff a letter stating that its quote would not be considered. With respect to Insight, the letter stated that Insight's quote was "received late." With respect to CenterScope, the letter stated that CenterScope's quote was a "partial submission" and "determined [to be] non-responsive" because USAID did not receive CenterScope's price quote until "after the stated deadline." In both letters, the contracting officer indicated that plaintiffs failed to comply with FAR § 15.208(a) pursuant to which "[o]fferors are responsible for submitting proposals . . . so as to reach the government office designated in the Solicitation by the time specified in the Solicitation."

On December 5, 2012, Mr. Jacobson sent Ms. Schulte and Ms. Dunn an email asking that USAID "advise [CenterScope] of all the documents received at USAID that were submitted [b]y [CenterScope] as well as the times received." Also on December 5, 2012, Ms. Dunn responded to Mr. Jacobson's email by emailing him a chart reflecting the chronology developed by Mr. Fulton.

On December 6, 2012, Mr. Fulton sent a request to Google Enterprise Support that stated: "Need connection MTA logs and explanation on why POSTINI was rejecting said message ID for 1.5 hours." In response, Google advised that it had opened a support ticket. Later on December 6, Vince Garcia from Google Enterprise Support responded to Mr. Fulton's question:

> I understand that a message was severely delayed because Postini was deferring the message with "451 Failed in remote data – PSMTP." This particular error message will be generated by Postini when either the sending e-mail server or the

---

it was extremely unlikely that two emails sent by different companies (which shared no common email infrastructure or providers) to the same servers at around the same time experienced different problems. Defendant did not rebut these assertions, in part, because USAID did not search its logs during the initial investigation of what happened with the messages in question or thereafter.

receiving e-mail server drops the SMTP connection with Postini before the SMTP transaction is complete.  When this occurs, Postini will record no additional information in our SMTP logs other than the "451 Failed in remote data – PSMTP" error that we send to the sending mail server.

The administrative record contains no further information about this communication from Google or about Mr. Garcia's role under the contract, education, training, or knowledge.  It is further not clear from the record where Mr. Garcia obtained the information reflected in his email.

Insight filed its complaint on December 11, 2012.  CenterScope filed its complaint on December 14, 2012.  On December 21, 2012, the court consolidated the cases.  On January 8, 2013, defendant filed the administrative record.[8]  On January 25, 2013, plaintiffs filed motions for judgment on the administrative record.  On February 8, 2013, defendant filed its cross-motion and response.  On February 19, 2013, plaintiffs filed their replies and responses, and on March 1, 2013, defendant filed its reply.  On March 5, 2013, the court held oral argument.

## II.     DISCUSSION

Before turning, in detail, to plaintiffs' claims, we begin with common ground.

### A.      Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact."  *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – have no place in deciding a motion for judgment on the administrative record.  *Id.* at 1356.  The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full-blown evidentiary proceeding.  *Id.*; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).  Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record."  *Bannum*, 404 F.3d at 1354; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcin*g, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).

---

[8]  After several additions to the administrative record to ensure its completeness (primarily to provide information regarding USAID's mail system), the administrative record was filed on February 8, 2013.

*Bannum*'s approach reflects well the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency. Failing to do so, the Federal Circuit has observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009). At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004), *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).[9] "Finally, because injunctive relief is relatively drastic in nature, a

---

[9] A review of Federal Circuit cases indicates that this prejudice analysis actually comes in two varieties. The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief. A second prejudice analysis is more in the nature of a standing inquiry. In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 108 n.5 (2003). Cases construing this second variation on the prejudice inquiry have held that it requires merely a "viable allegation of agency wrong doing," with "'viability' here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 718-19 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006). This "viability" standard is reminiscent of the "plausibility" standard enunciated in several recent Supreme Court cases. *See Dobyns v. United States*, 91 Fed. Cl. 412, 422-28 (2010) (discussing the "plausibility standard" of pleading drawn from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

plaintiff must demonstrate that its right to such relief is clear." *NEQ*, 88 Fed. Cl. at 47; *see also Banknote*, 56 Fed. Cl. at 380-81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

### B.       Should Plaintiffs' Quotations Have Been Rejected by USAID?

For procurements of commercial items, FAR § 52.212-1(f)(1) states that "[o]fferors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation." Amplifying this rule, FAR § 52.212-1(f)(2)(i) provides that "[a]ny offer . . . received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered." As defendant points out, these provisions often have been construed narrowly, summed up by the aphorism "late is late." *See* Brian G. Walsh & Nooree Lee, "Is Late Always Late?  Recent COFC and GAO Decisions Introduce Uncertainty in Protests Requesting Consideration of 'Late' Proposals," 48 Procurement Law. 11, 11 (2013). Under these provisions, undoubtedly, "it is an offeror's responsibility, when transmitting its proposal electronically, to ensure the proposal's timely delivery by transmitting the proposal sufficiently in advance of the time set for receipt of proposals to allow for timely receipt by the agency." *Philips Healthcare Informatics*, 2012 C.P.D. ¶ 220 (2012); *see also Associated Fabricators & Constructors, Inc.*, 2011 C.P.D. ¶ 279 (2011).

Briefing and argument in this case suggest that defendant approaches questions involving the timeliness of an electronic submission under FAR § 52.212-1(f)(1) with the zeal of a pedantic schoolmaster awaiting a term paper.  It maintains, for example, that if a solicitation specifies that proposals should be directed to a particular email account, an offer must be received in that addressee's inbox in order for it to be timely received under the regulation.  *See also Symetrics Indus., LLC*, 2006 C.P.D. ¶ 154 (2006).  In its view, a proposal is late, even if it is successfully and iteratively processed through several agency mail servers, if the last of those servers delays the delivery of the email to the recipient's inbox; indeed, at oral argument, defendant went so far as to contend that such a proposal would be late if, owing to the design of the agency's email system, the email was not distributed to the recipient's inbox because he or she had turned off their computer before the deadline and did not reboot until the deadline passed.[10]  Presumably, defendant would have the same view if the contracting officer's email program experienced a

_____

(2007)).  Because of the nature of the allegations of error here, the court is convinced that plaintiffs have met this preliminary "standing" threshold.

[10]  Of course, defendant contends this would never happen as agency contracting officers would always be sitting at their work station, ready to receive the proposals as they were forwarded by the agency mail server.  That the timeliness of a contractor's proposal – and whether that contractor can participate in a multi-million dollar procurement – should depend upon whether the contracting officer is standing by, or instead innocently shuts down his or her computer upon becoming ill or to go get a soda, is the first hint that something is amiss with defendant's proposition, as further review below confirms.

loss of network connectivity, an internal programming error, a failure of the associated hardware, or one of a host of other problems that might affect the ability of that program to receive email.

There are, however, exceptions to the "late is late" rule. A series of these are contained in FAR § 52.212-1(f)(2)(i), which provides that the "late is late" rule will not apply if the proposal –

> is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—
>
> (A)  If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or
>
> (B)  There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or
>
> (C)  If this solicitation is a request for proposals, it was the only proposal received.

*See also* FAR § 15.208(b)(1) (providing a similar rule for negotiated procurements); FAR § 52.215-1(c)(3)(ii)(A) (same for competitive acquisitions).[11]  The first two of the three exceptions in subparagraph (i) are commonly known as the "Electronic Commerce" and "Government Control" exceptions, respectively.  A fourth regulatory exception, known as the "Emergency/ Unanticipated Event" exception, comes from FAR § 52.212-1(f)(4), which states –

> If an emergency or unanticipated event interrupts normal Government processes so that offers cannot be received at the Government office designated for receipt of offers by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation or other notice of an extension of the closing date, the time specified for receipt of offers will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

*See also* FAR §§ 15.208(d); 52.215-1(c)(3)(iv).  A fifth, and final, exception has been fashioned by the GAO, which has long-held that a "hand-carried proposal that arrives late may be

---

[11]  The cited regulations are essentially identical to FAR § 52.212-1(f)(2)(i), and, as will be discussed, contain exceptions that are identical to those in FAR § 52.212-1(f)(4). Accordingly, this opinion views authorities construing these other regulations as bearing upon the proper interpretation of the regulation in question.

considered if improper government action was the paramount cause of the late submission and consideration of the proposal would not compromise the integrity of the competitive procurement process." *Noble Supply & Logistics*, 2011 C.P.D. ¶ 67 (2011).[12]

While plaintiffs make various arguments, their banner claim is that the Government Control exception applies here – that their electronic proposals were "received at the Government installation designated for receipt" of their quotations and that the proposals were "under the Government's control prior to the time set for receipt of offers."  FAR § 52.212-1(f)(2)(i)(B).  Not so, defendant contends, asseverating that the Government Control exception simply does not apply to electronic submissions.  Resolving this dispute obviously requires the court to construe the relevant FAR provisions.

Courts construing these exceptions admittedly must walk a fine line.  Construed too broadly, the exceptions could undermine the "late is late" rule, and with it, the principles that underlie this provision – "fairness and preservation of competition," *Electronic On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 167 (2012), as well as the avoidance of "confusion," *Alalamiah Tech. Grp.*, 2010 C.P.D. ¶ 148 (2010).  *See also Agencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 173 (2005); *Tishman Constr. Corp.*, 2003 C.P.D. ¶ 94 (2003).  As noted by the Federal Circuit, "[t]here are inherent competitive advantages to submitting a proposal after all other parties are required to do so," including the ability to make "last minute changes to the proposal."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009); *see also Data Gen. Corp.*, 78 F.3d at 1561.  Yet, construing the exceptions too narrowly, particularly where some government failure or breakdown is the evident cause of the lateness of a submission, introduces its own discomforting unfairness and arbitrariness into the Federal procurement process, with the potential of unduly limiting competition and giving certain offerors an undeserved advantage.  *See Elec. On-Ramp*, 104 Fed. Cl. at 163; *see also Lab. Corp. of Am.*, 108 Fed. Cl. at 569.  Considerations like these led the GAO to craft its common law exception to the lateness rule.[13]  Mindful of these thoughts, "the law reflects that in some

---

[12]  Notably, the cases applying this exception pre- and post-date the promulgation of the current regulations involving the lateness rule.  *See, e.g., ALJUCAR, LLC*, 2009 C.P.D. ¶ 124 (2009); *Shirlington Limousine & Transp., Inc.*, 2007 C.P.D. ¶ 68 (2007); *Hosp. Klean of Tex.*, 2005 C.P.D. ¶ 185 (2005); *O.S. Sys., Inc.*, 2003 C.P.D. ¶ 211 (2003); *Integrated Support Sys., Inc.*, 99-2 C.P.D. ¶ 51 (1999); *Caddell Constr. Co., Inc.*, 98-2 C.P.D. ¶ 50 (1998); *Med-Nat'l, Inc.*, 97-2 C.P.D. ¶ 67 (1997); *Occu-Health, Inc.*, 92-2 C.P.D. ¶ 314 (1992); *Vikonics, Inc.*, 86-1 C.P.D. ¶ 419 (1986); *see also, e.g., Conscoop-Consorzia Fra Coop. Di Prod. E. Lavoro v. United States*, 62 Fed. Cl. 219, 234 (2004), *aff'd*, 159 Fed. Appx. 184 (Fed. Cir. 2005) (describing this line of cases).  This court adopted the same rule in *Hospital Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 621-24 (2005).  *See also Shirlington Limousine & Transp., Inc. v. United States*, 77 Fed. Cl. 157, 168-70 (2007).

[13]  According to the GAO, this exception was developed because, even when a bid is received late, the exception "give[s] all bidders and equal opportunity, . . . prevent[s] fraud,

circumstances it is more faithful to the preservation of competition to consider a late proposal than it is to reject it." *Elec. On-Ramp*, 104 Fed. Cl. at 163; *see also* Ralph C. Nash, "Postscript II: Late is Late," 26 No. 1 Nash & Cibinic Rep. ¶ 1 (2012) ("[I]t makes sense to arrive at an interpretation of the late proposal rule that permits acceptance of [as] many proposals as possible. If we believe that competition will give the Government the best buy, narrowing the competition by trying to reject as many proposals as possible seems counterproductive.").

Fortunately, the law does not leave this court adrift on this count as it provides ready guidance regarding how the court should interpret these exceptions. It is a basic tenet that "[t]he rules of statutory construction apply when interpreting an agency regulation." *Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006); *see also Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 853 (1986); *Gen. Elec. Co. v. United States*, 610 F.2d 730, 734 (Ct. Cl. 1979). The court thus must "review[] [the regulation's] language to ascertain its plain meaning." *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1299 (Fed. Cir. 2008); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-15 (1945) (focusing on the "plain words of the regulation" to ascertain its meaning); *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). As context is always important, the court may consider the language of other, related regulations to guide its analysis. *Roberto*, 440 F.3d at 1350; *see also Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577-78 (Fed. Cir. 1995) (en banc). When there is no ambiguity in a regulation, the courts must enforce it according to its obvious terms and not "insert words and phrases, so as to incorporate [therein] a new and distinct provision." *United States v. Temple*, 105 U.S. 97, 99 (1881); *see also Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1347 (Fed. Cir. 2005); *CS-360, LLC v United States*, 94 Fed. Cl. 488, 498 (2010).

Contrary to defendant's claim, the plain meaning of the Government Control exception does not exclude from its coverage electronic communications. There is no explicit caveat to that effect in either the exception's language or the accompanying lateness provisions. More importantly, the language employed in the exception is broader than defendant claims – broad enough, as it turns out, to encompass the electronic transmission of a quotation. By its terms, the exception applies if four requirements are satisfied: (i) the offer is received before the award is made; (ii) consideration of the offer would not unduly delay the acquisition; (iii) the offer was "received at the Government installation designated for receipt of offers;" and (iv) the offer "was under the Government's control prior to the time set for receipt of offers." *See* FAR § 52.212-1(f)(2)(i); *see also Elec. On-Ramp*, 104 Fed. Cl. at 161. Defendant readily admits that the first two of these requirements theoretically can apply to emailed proposals and were satisfied here.

---

and . . . preserve[s] the integrity of the competitive bid system." *Acting Comptroller Gen. Weitzel to the Sec'y of the Navy*, 34 Com. Gen. 150, 151 (1954); *see also Palomar Grading & Paving, Inc.*, 97-1 C.P.D. ¶ 16 (1997) ("one of the fundamental principles underlying the rules for consideration of late bids is that a bidder who has done all it could and should to fulfill its responsibility should not suffer if the bid did not arrive as required because the government failed in its own responsibility"); *Lechase Constr. Corp.*, 75-2 C.P.D. ¶ 5 (1975) (holding that a late bid could be considered under this exception because it would not compromise "the integrity of the competitive bidding system").

And it mounts no serious defense as to the fourth of these conditions – that requiring actual government control.  It argues, however, that the third of the requirements listed above was not – and, indeed, could not be – satisfied here because electronic transmissions cannot be "received" at a Government "installation" so as to trigger the exception.  As will be seen, that premise proves incorrect.

The word "receive" is defined principally as an action "to take or acquire (something given, offered, or transmitted)."  The American Heritage College Dictionary 1139 (1997); *see also* Webster's Third New Int'l Dictionary (Unabridged) 1894 (2002) ("to take possession or delivery of").  And this is how this term is generally understood in legal matters.[14]  The court sees no reason why such possession cannot be effectuated through a government computer server, any less than through a clerk in a government mail room.  *See Elec. On-Ramp*, 104 Fed. Cl. at 162.  Given this, it consequently sees no reason to question whether the proposals in question were "received" when the Google Postini server "took" the electronic messages submitted by plaintiffs, submitted them to security checks, and, once those checks were passed, attempted to forward them, albeit unsuccessfully, to the second server in USAID's mail system, the bridgehead server.[15]  This conclusion finds support not only in cases that have held that a

---

[14]  *See, e.g.*, *United States v. Mazza-Alaluf*, 621 F.3d 205, 212 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 583 (2010) (defining "receive" in the context of a Michigan statute dealing with money transmission services); *United States v. Olander*, 572 F.3d 764, 769 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1113 (2010) (defining "receive" in the context of a Federal child pornography statute); *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (same); *United States v. Flippen*, 861 F.2d 266 (4th Cir. 1988) (same); *United States v. Laurent*, 861 F. Supp. 2d 71, 84-85 (E.D.N.Y. 2011) (defining "receive" in the context of a Federal statute prohibiting felons from receiving firearms); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at \*16 (E.D.N.Y. Oct. 5, 2006) (defining "receive" in the context of a Federal statute prohibiting the financing of terrorism); *Watterson Constr.*, 98 Fed. Cl. at 93 (defining "receive" in the context of FAR § 52.215-1(c)(3)(i)-(ii)); *Rooks v. Sec'y of Dep't of Health and Human Servs.*, 35 Fed. Cl. 1, 11 (1996) (defining "receive" under the Vaccine Act).

[15]  Based on the administrative record, the court makes two findings.  *See Bannum*, 404 F.3d at 1354.  First of all, based on its review of that record, the court credits the explanation of the "451 message" found in the documentation for the Google Postini server rather than the explanation provided in the email that Mr. Fulton received from a Google employee, Vince Garcia.  The explanation found in the formal documentation is inherently more reliable, and is supported by an expert declaration that one of the plaintiffs has submitted describing how USAID's email service works.  By comparison, defendant has provided no evidence that would allow the court to gauge the accuracy or reliability of Mr. Garcia's statement – indeed, it appears he may not have understood all the relevant facts.  Second, while the log records provided by Insight provide a more definitive view of what happened to its proposals, the court finds that the evidence provided by CenterScope is adequate to support the view that its proposal also became captive to the glitch in the USAID email system.

proposal is "received" under this exception (and parallel exceptions in the FAR) once the contractor permanently transfers control of the proposal to an agency,[16] but also in at least one case that specifically has held that a server "received" an electronic proposal, *see Watterson Constr.*, 98 Fed. Cl. at 93.

This makes no difference, defendant claims, because a computer server is not an "installation" within the meaning of the exception. On brief, defendant blithely argued that this was true because the term "installation" should be defined as "any military post, camp, base, etc." In its fervor to make this argument, defendant apparently overlooked the fact that the FAR applies to civilian facilities, making defendant's construction, to say the least, a bit strained. Confronted with this incongruity at oral argument, defendant made a hasty retreat from its military-inspired definition of "installation," while still unabashedly maintaining – albeit now without any supporting dictionary definitions – that an email server cannot be an "installation." In fact, the dictionary definition of the word "installation" – "something that is installed for use," Webster's Third New Int'l Dictionary (Unabridged) 1171 (2002), or "[t]he state of being installed . . . ; [a] system of machinery or other apparatus set up for use," The American Heritage College Dictionary 704 (1997) – are much more expansive than defendant's formulation. The breadth of this definition is reflected in its application in the decisional law, which does not suggest that this term offers much in the way of limitations.[17] Nor, as will be explained in greater detail below, is there any contextual basis for adopting a narrower than normal meaning here. Given the sweep of this term, the court has little difficulty in concluding that – much like a mail room or other depository in a building, to which paper proposals can be delivered – a server controlled by the government most certainly can be an "installation" that receives electronic submissions.

Read literally, then, the language of the Government Control exception can apply to electronic transmissions. In arguing otherwise, defendant invokes the canon of statutory construction under which "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). It contends, via this canon, that the Electronic Commerce

---

[16] *See Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 527 (2011); *Watterson Constr.*, 98 Fed. Cl. at 91; *Haskell Co.*, 2003 C.P.D. ¶ 202 (2003); *Weeks Marine, Inc.*, 2003 C.P.D. ¶ 183 (2003).

[17] *See, e.g.*, *Shirlington Limousine & Transp.*, 77 Fed. Cl. at 172 (citing *Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 298 n.33 (1998)) (defining "installation," in the context of the FAR, to mean "a single geographical location"); *Natural Res. Def. Council v. EPA*, 725 F.2d 761, 765 (D.C. Cir. 1984) (adopting Environmental Protection Agency's broad definition of "installation" in construing the Clean Air Act); *Ala. Power Co. v. Costle*, 636 F.2d 323, 395-96 (D.C. Cir. 1979) (same); *Families for Asbestos Compliance, Testing and Safety v. City of St. Louis, Mo.*, 2008 WL 4279569, at *9 (E.D. Mo. Sept. 15, 2008) (same). The court cannot help but observe that, in many of these cases, as well as those above defining the term "receive," defendant was the one that pushed the courts not to adopt a narrower than normal meaning for these terms. Apparently, the shoe is on the other foot here.

- 14 -

exception trumps the Government Control exception, rendering the latter inapplicable to electronic communications.  Defendant emphasizes that the GAO has taken this view in a number of protests – and so it has.[18]  But, with all due respect, the GAO's opinions in these protests fail to persuade as they all share the same defect – they discount the plain meaning of the terms in the regulation in favor of what appears to be a misapplication of the general/specific canon.

As recently noted by the Supreme Court, "[t]he general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012); *see also Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one. . . ."). But, "the canon has full application as well" to situations "in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel*, 132 S. Ct. at 2071. In this situation, "the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *Id.* at 2071 (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).[19] The canon, however, "can be overcome by textual indications that point the other direction," and does not apply, for example, where "the specific provision embraced within a general one is not superfluous, because it creates a so-called safe harbor." *RadLAX Gateway Hotel*, 132 S. Ct. at 2071.

In the court's view, the Electronic Commerce exception creates a safe harbor for proposals transmitted using an electronic commerce method if it is "received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers." FAR § 52.212-1(f)(2)(i)(A). This safe harbor applies only to proposals submitted at least a day before the offer is due. At 5:00 pm on the day before proposals are due that safe harbor ceases to exist; the other exceptions, however, still apply, thereby safeguarding contractors which, through no fault of their own, find themselves unable to deliver their proposal to the government office designated for receipt of a proposal. Viewed this way, it is evident that these provisions do not have coincident operation – the Electronic Commerce safe harbor neither conflicts with, nor is rendered superfluous by, either the Government Control or Emergency/Unanticipated Event exceptions, which serve their own distinct purposes for both paper and electronic filings. *See SEC v. Familant*, 2012 WL 6600339, at *10 (D.D.C. Dec. 19, 2012) (refusing to apply the general/specific canon where some actions

---

[18] *See, e.g.*, *Alalamiah Tech. Grp.*, 2010 C.P.D. ¶ 148 (2010); *Urban Title, LLC*, 2009 C.P.D. ¶ 31 (2009); *Symetrics Indus., LLC*, 2006 C.P.D. ¶ 154 (2006); *Sea Box, Inc.*, 2002 C.P.D. ¶ 181 (2002); *see also Conscoop-Consorzia*, 62 Fed. Cl. at 239-40 (2004).

[19] *See also Bloate v. United States*, 130 S. Ct. 1345, 1354 (2010); *United States v. Chase*, 135 U.S. 255, 260 (1890); *United States v. Carter*, 696 F.3d 229, 233 (2d Cir. 2012).

covered by a subsection of a regulation "remain outside the grasp" of other subsections).[20]  Even if this were not the case, it is well worth remembering that, like other interpretative canons, the specific/general canon is "no more than an aid to construction" that "comes into play only when there is some uncertainty as to the meaning of a particular clause."  *United States v. Turkette*, 452 U.S. 576, 581 (1981); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Moher v. United States*, 875 F. Supp. 2d 739, 768 (W.D. Mich. 2012) ("The general/specific canon of statutory construction is not an absolute rule.").  It should be wielded neither to create textual uncertainty that otherwise does not exist, nor to "warrant confining the operations of a [regulation] within narrower limits than were intended."  *United States v. Kennedy*, 233 F.3d 157, 161 n.4 (2d Cir. 2000); *see also United States v. Johnson*, 655 F.3d 594, 604 (7th Cir. 2011).

        That each of these exceptions – Electronic Commerce, Government Control, Emergency/ Unanticipated Event, *etc.* – should be viewed neither as mutually exclusive nor preemptive is reinforced by the regulatory history of the FAR provisions in question.  *See Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1139 (Fed. Cir. 1995) (noting the relevancy of such history in construing regulations).  That history reveals that the 1997 version of a provision analogous to that at issue – 48 C.F.R. § 52.215-1(c)(3) (1997) – had six exceptions, four of which referenced specific forms of delivery:  (i) registered or certified mail; (ii) mail, telegram, facsimile, or hand-carried; (iii) U.S. Postal Service Express Mail Next Day Service; and (iv) electronic commerce.[21]  Rounding out this list were two exceptions that were more general, at least in the sense that they did not make reference to a particular delivery method – one of these was for any late proposal

_____

[20]  In distinguishing between the Electronic Commerce safe harbor and the Government Control exception, it should not be overlooked that the latter, unlike the former, requires not only that the proposal be received, but also that it be under the "government's control."  *See* FAR § 52.212-1(f)(2)(i)(B).  That distinction might prove important in a case where an electronic transmission is received at the entry point by 5:00 pm on the day before submissions are due, but rejected by the initial server in the agency's mail system and returned to the sender.  In that instance, the transmission might qualify under the safe harbor, even though it was not under the government's control.  *See Elec. On-Ramp, Inc.*, 104 Fed. Cl. at 161 (emphasizing that "a proposal may be 'received' without being under government 'control'").

[21]  The Electronic Commerce exception was first promulgated in 1995.  According to the preamble to the proposed regulation, it and comparable provisions were designed "to accommodate the use of electronic systems which batch-process communications overnight and, therefore, require receipt of information one day in advance to ensure timely delivery to the designated address."  60 Fed. Reg. 12,384, 12,384 (Mar. 6, 1995).  Given how this case has played out, it is interesting that the drafters of that provision further indicated that "[t]he proposed rule is expected to have a positive impact on a substantial number of small entities . . . because it encourages broader use of electronic contracting, thereby improving industry access to Federal contracting opportunities."  *Id.* at 12,385; *see also Watterson Constr.*, 98 Fed. Cl. at 96.

that was the only one received, and the other was the Government Control exception.[22]  Now, if one extends defendant's "specific-trumps-the-general" rule to this set of exceptions, one is left with the remarkable conclusion that, in 1997, the Government Control exception applied to nothing – absolutely nothing – because the FAR then contained more specific exceptions that covered every conceivable form of delivery.  Talk about superfluity.  This construction would have made no sense in 1997.  And its corollary – embedded in defendant's claims – makes no sense today.  Indeed, while arguing that electronic submissions are not subject to the

---

[22]  The full version of the regulation looked as follows:

(c)(3)(i) Any proposal received at the office designated in the solicitation after the exact time specified for receipt of offers will not be considered unless it is received before award is made and—

(A) It was sent by registered or certified mail not later than the fifth calendar day before the date specified for receipt of offers (e.g., an offer submitted in response to a solicitation requiring receipt of offers by the 20th of the month must have been mailed by the 15th);

(B) It was sent by mail (or telegram or facsimile, if authorized) or hand-carried (including delivery by a commercial carrier) if it is determined by the Government that the late receipt was due primarily to Government mishandling after receipt at the Government installation;

(C) It was sent by U.S. Postal Service Express Mail Next Day Service–Post Office to Addressee, not later than 5:00 p.m. at the place of mailing two working days prior to the date specified for receipt of proposals.  The term "working days" excludes weekends and U.S. Federal holidays;

(D) It was transmitted through an electronic commerce method authorized by the solicitation and was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(E) There is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers, and the Contracting Officer determines that accepting the late offer would not unduly delay the procurement; or

(F) It is the only proposal received.

*See* 48 C.F.R. § 52.215-1(c)(3) (1997); *see also* 62 Fed. Reg. 51,233, 51,259 (Sept. 30, 1997); *Watterson Constr.*, 98 Fed. Cl. at 94.

Government Control exception, defendant acknowledges that they are subject to the Emergency/Unanticipated Event exception – a *non sequitur*, if the "specific" provision of the Electronic Commerce exception trumps all the other "general" exceptions in the adjoining FAR provisions. *See Watterson Constr.*, 98 Fed. Cl. at 95-97 (rejecting, based on the words of the regulation and its regulatory history, defendant's claim that the Government Control exception does not apply to electronic submissions).[23]

Though not controlling, from a policy perspective, it must be observed that defendant's cramped construction of the Government Control exception makes little sense. If defendant is correct, one must conclude that the drafters of the FAR decided to impose on contractors the risk that, without warning, an agency computer could fail, causing a proposal electronically transmitted with reasonable time for it to be received to instead be declared late and out of the competition. The only way for a contractor to avoid this risk, according to defendant, is for it to file its proposal by 5:00 pm on the day before the submission is due – essentially, suggesting that whenever a solicitation or its equivalent requires electronic transmission, the due date should be viewed as being a day ***earlier*** than actually stated. Defendant provides no explanation why the drafters of the FAR would want to do this – why they would want to impose unique burdens on companies submitting electronic proposals by providing them with less protection than is afforded to contractors who submitted their proposals in paper form? *Compare* FAR § 4.502(a) ("The Federal Government shall use electronic commerce whenever practicable or cost-effective."). Finally, the limitations that defendant would have this court engraft onto the FAR would leave those rules out of harmony with the commercial rules generally applied to electronic transmissions – among them the Uniform Electronic Transactions Act (UETA), *see* Uniform Law Comm'n, Uniform Elec. Transactions Act §15b (1999). The UETA, which has been adopted in almost every state, holds that an electronic document is received when it enters the recipient's computer system.[24] Can it be that the drafters of the FAR intended a dramatically

---

[23] In reaching its contrary conclusion, the GAO, in *Sea Box*, indicated that the Government Control "exception may be broad enough to encompass situations involving electronic commerce delivery methods" and admitted that the exclusion of electronic submissions is "not expressly stated in the regulation." *Sea Box, Inc.*, 2002 C.P.D. ¶ 181 (2002). It, nevertheless, concluded that the Government Control exception did not apply to electronic submissions because a contrary ruling would render the Electronic Commerce exception a "nullity." *Id.* That is simply not the case, for the reasons described above. One is left to wonder why the GAO refuses to apply the literal language of the Government Control exception while continuing to apply a fifth exception to the "late is late" rule for hand-carried paper proposals – when the government is the "paramount cause" of the delay – that has no grounding whatsoever in the language of the FAR.

[24] The UETA is a "leading U.S. model law for electronic commerce, which almost all the U.S. states have adopted and which shapes many of the rules of electronic commerce in the United States." Sue Arrowsmith, "Reform of the UNCITRAL Model Law on Procurement: Procurement Regulation for the 21st Century" § 10:6 (2010). Section 15(b) of the Act provides:

different rule to apply to contractors conducting electronic transactions in the Federal procurement sphere?[25]

While these incongruities provide no reason to deviate from the terms of the regulation to expand the Government Control exception, they most certainly do not warrant confining the operation of that exception within narrower limits than its words connote. "Late is late" is no excuse for doing this either, as that phrase would become little more than an empty mantra if it justified myopic interpretations of the FAR that led to arbitrary results. The court must turn a deaf ear to defendant's siren song of regulatory nullification.

This is not to gainsay that a contractor which waits until the last moment before emailing its proposal should benefit from this exception. Rather, the court merely holds that, in the case of an electronic delivery, the Government Control exception applies where the electronic proposal is received by a government server (or comparable computer) and is under the agency's control prior to the deadline. *See Watterson Constr.*, 98 Fed. Cl. at 97. This opens no Pandora's (mail)box – it merely applies that exception, as written, to the technology that agencies themselves choose to employ. Because USAID did not give the exception its proper sway in rejecting the quotes in question, its actions were inconsistent with the FAR and thus arbitrary, capricious, an abuse of discretion, and contrary to law. *See, e.g.*, *Lab Corp. of Am.*, 108 Fed. Cl. at 567-68; *BH & Assocs.*, 88-1 B.C.A. ¶ 20340 (1987). It is beyond peradventure that this action prejudiced plaintiffs – that they have suffered a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine*, 575 F.3d at 1361 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)); *see also Sys. Application & Techs., Inc. v. United*

---

Unless otherwise agreed between a sender and the recipient, an electronic record is received when:  (1) it enters an information processing system that the recipient has designated or uses for the purpose of receiving electronic records or information of the type sent and from which the recipient is able to retrieve the electronic record; and (2) it is in a form capable of being processed by that system.

UETA § 15b (1999); *see also* Uniform Law Comm'n, Electronic Transactions Act *available at* http://www.uniformlaws.org/Act.aspx?title=Electronic%20Transactions%20Act  (last visited Apr. 17, 2013) (indicating that the act has been adopted in 47 states).

[25]  Notably, courts have recognized that the FAR generally should be interpreted in a way that is consistent with the principles of general commercial law and model rules. *See Conoco Inc. v. United States*, 35 Fed. Cl. 309, 322 (1996), *aff'd*, 236 F.3d 1313 (Fed. Cir. 2000) ("To the extent that the [UCC] is not inconsistent with federal law, it is also commonly used to provide guidance in determining the rights and liabilities of the parties to a public contract."); *see also Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411 (1947); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); *Keydata Corp. v. United States*, 504 F.2d 1115, 1122 (Ct. Cl. 1974).

*States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).  Accordingly, it falls to this court to remedy their injuries.[26]

### C.    Injunctive Relief

Having concluded that the instant procurement was legally flawed and that plaintiffs were thereby prejudiced, the court must determine whether plaintiffs have made three additional showings to warrant injunctive relief, *to wit*, that:  (i) they will suffer immediate and irreparable injury; (ii) the public interest would be better served by the relief requested; and (iii) the balance of hardships on all the parties favors plaintiffs.  *Lab. Corp. of Am.*, 108 Fed. Cl. at 568; *Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 137 (2006); *Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 730 (2004); *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  No one factor is dispositive in this regard, as "the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Lab Corp. of Am.*, 108 Fed. Cl. at 568; *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  In the case *sub judice*, the existence of irreparable injury to plaintiffs, the balancing of harms in favor of the plaintiffs, and the public interest all lead this court to grant injunctive relief to plaintiffs.

### 1.    Irreparable Harm

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *see also Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008).  Plaintiffs argue that they will suffer irreparable harm if an injunction is not granted, because the only other available relief – the potential for recovery of bid preparation costs – would not redress their loss of valuable business on the contract in question.  This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.  *See id.* at 501-02; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) (loss of "the opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm"); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").  Accordingly, plaintiffs have demonstrated adequately that they will suffer irreparable harm if injunctive relief is not forthcoming.

---

[26]  Because the court concludes that plaintiffs' submissions were covered by the Government Control exception, it need not consider whether those submissions were covered by any of the other late-filing exceptions in the applicable FAR provisions.

### 2.   Balance of Hardships

Under this factor, "the court must consider whether the balance of hardships leans in the plaintiff's favor," requiring "a consideration of the harm to the government." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006); *see also Lab Corp. of Am.*, 108 Fed. Cl. at 568; *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003). Defendant intimates that enjoining the performance of the task order would delay implementation of a project designed to benefit USAID's mission. But, this court has observed that "'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *Id.* (quoting *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999)); *see also Lab. Corp. of Am.*, 108 Fed. Cl. at 569; *Serco Inc.*, 81 Fed. Cl. at 502; *Reilly's Wholesale*, 73 Fed. Cl. at 715-16. Defendant has offered no reason why this is such an exceptional case.

In suggesting that an injunction ought not be issued, defendant also asserts that allowing plaintiffs to participate in this procurement would harm the offeror that timely submitted its offer. As it has in other cases, it argues that plaintiffs should not be given special treatment and extra time to submit their proposal. *See Labatt Food Serv.*, 577 F.3d at 1381; *Elec. On-Ramp*, 104 Fed. Cl. at 162. Of course, any harm flowing to the other offeror here stems from defendant's own arbitrary and capricious actions. Moreover, as this court recently stated in another case in which defendant made the same argument, "none of [the] offerors are entitled to an award under this procurement based upon the legally erroneous exclusion of plaintiff from the competition." *Lab Corp. of Am.*, 108 Fed. Cl. at 569. Finally, any *bona fide* concerns defendant has in terms of maintaining an even playing field here may be addressed via the terms of the injunction and the flexibility it will afford defendant on how to proceed.

### 3.   Public Interest

Plaintiffs also contend that the public interest will be served by granting the requested injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA*, 57 Fed. Cl. at 663; *see also Rotech Healthcare Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan*, 27 Fed. Cl. at 448. In the present case, the public's interest likewise lies in preserving the integrity of the competitive process.

## III.   CONCLUSION

Based on the foregoing:

1.   Plaintiffs' motions for judgment on the administrative record are **GRANTED** and defendant's cross-motion for judgment on the administrative record is **DENIED**.

2.      Defendant, acting by and through the United States Agency for
        International Development, is hereby **ENJOINED** from evaluating
        quotations received, and making an award, under Request for
        Quotation No. SOL-0AA-000068, unless the United States
        Agency for International Development makes provision to accept
        quotations from Insight Systems Corp. and CenterScope Technologies,
        Inc., and evaluate them on the same terms as other quotations
        already received (or amended quotations to be received).

3.      Alternatively, defendant, acting by and through the United States
        Agency for International Development, may conduct a new
        procurement for the services described in Request for Quotation No.
        SOL-0AA-000068.

4.      Nothing herein shall be deemed to prevent defendant and plaintiffs
        from mutually agreeing to resolve this matter in such fashion as they deem
        appropriate.

5.      This opinion shall be published, as issued, after May 3, 2013, unless
        the parties identify protected and/or privileged materials subject to
        redaction prior to that date.  Any such materials shall be identified
        with specificity, both in terms of the language to be redacted and the
        reasons for each redaction (including appropriate citations to authority).

**IT IS SO ORDERED.**


                                          s/Francis M. Allegra
                                          Francis M. Allegra
                                          Judge